**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SARAH MARTIN,                   :
                                :   CIVIL ACTION
        Petitioner             :
                                :
    vs.                         :   NO. 20-CV-0686
                                :
NTT DATA, INC.,                 :
                                :
        Respondent             :

## MEMORANDUM AND ORDER

**JOYNER, J.**                                    **June   23, 2020**

The instant case has been brought before the Court on Petition of Sarah Martin to Vacate an Arbitration Award issued on January 6, 2020 by an independent arbitrator and the Cross-Petition of NTT Data, Inc. to Confirm that award.  For the reasons which follow, the Petition to Vacate shall be denied and the Cross-Petition to Confirm granted.

## Factual Background

Petitioner, Sarah Martin, commenced this employment discrimination action against NTT Data, Inc. by first filing a Complaint of Discrimination with the EEOC[1] on April 7, 2017.  Ms. Martin had been employed by NTT Data and/or its predecessors for 32 years before her termination on March 9, 2017, ostensibly for

---

[1] Plaintiff asked that her Discrimination Complaint also be filed with the Pennsylvania Human Relations Commission ("PHRC") by checking off the appropriate box on the EEOC form.

the reason that her position as an executive was being
eliminated.  According to Petitioner, however, there had long
existed at NTT Data a culture of discrimination against women in
favor of men about which she had complained numerous times over
the years.  Petitioner further avers that immediately following
her termination, all of her job responsibilities were
transferred to a male executive, Ande Lake, who kept the same
title as that which Plaintiff had held.

Following receipt of a "right-to-sue" letter on September
29, 2017, Petitioner filed a Demand for Arbitration with JAMS, a
private arbitration company, on December 27, 2017 pursuant to an
Arbitration Agreement which she had entered into with NTT Data.
That agreement provided in pertinent part:

> "[a]s a condition for participation in the Company's Long
> Term Incentive Plan and not in reliance on any promises or
> representations by the Company other than those, if any,
> contained in the Agreement itself," "[a]ny dispute or
> controversy justiciable under federal, state or local law
> between Employee and the Company …including but not limited
> to, a dispute or controversy arising out of or relating to
> Employee's employment with Company … or involving claims of
> discrimination…"  would be submitted to JAMS or its
> successor "for final and binding arbitration."

In her initial Arbitration Demand, Ms. Martin asserted a
single count under Title VII of the Civil Rights Act of 1964, 42
U.S.C. §2000e, *et. seq.* ("Title VII") for discrimination based
on her sex and retaliation for her "complaints about the same."
On January 12, 2018, Respondent employer filed its Answer,

Affirmative Defenses and Counterclaim in which it raised a claim for breach of contract against Petitioner based upon her alleged failure to comply with the terms of her Confidentiality Agreement with the company by copying purportedly confidential and proprietary business information and not returning it for several months.  Some two weeks later, Petitioner responded by filing an Amended Demand for Arbitration claiming that the counterclaim was made in retaliation for her initial Demand for Arbitration.  Subsequently, after arbitration proceedings had formally commenced, a Second Amended Demand for Arbitration was submitted adding a claim for discrimination and retaliation under the Pennsylvania Human Relations Act, 43 P.S. §951, *et. seq.* on April 9, 2018.

In its January 26, 2018 formal notice to all parties of Commencement of Arbitration, JAMS provided a list of five available arbitrators with their hourly rates, locations, *curriculum vitaes* and individual procedures, together with copies of JAMS Arbitration Policies and Rules & Procedures.  The Notice included the following:

> …The parties are encouraged to mutually agree to an arbitrator.  If the parties are unable to mutually agree to an arbitrator, then using the following list of arbitrator candidates each party may strike two (2) names and rank the remaining candidates in order of preference. The deadline for return of your strike list is on **Monday, February 5, 2018.** [Note: Strike lists should not be exchanged amongst the parties.] …

If a party fails to respond to the list of arbitrator
candidates in a timely manner, that party shall be deemed
agreeable to all the proposed candidates.  JAMS will then
confirm the appointment of the arbitrator and begin
scheduling.  If the parties are unable to agree on a date
and time, the arbitrator shall determine those issues.

It is unclear from the existing record whether the parties
here were able to mutually agree or what strikes, if any, were
registered to any of the arbitrators listed.  In any event, on
February 7, 2018, Vivien B. Shelanski, Esquire was appointed to
serve as the arbitrator in the case.  As noted in the Demand for
Arbitration form, "[f]or matters based on a clause of agreement
that is required as a condition of employment, the employee is
only required to pay $400."  The filing fee alone to initiate
the arbitration process in two-party matters is $1,200.00.  The
Appointment of Arbitrator notice further stated:

The Arbitrator will bill in accordance with the enclosed
Fee Schedule.  The arbitration will be administered
consistent with the enclosed JAMS Policy on Employment
Arbitration, Minimum Standards of Procedural Fairness.
According to this Policy, the only fee a consumer employee
may be required to pay is $400 of the Filing Fee.  All
other costs, including the remainder of the Filing Fee,
must be borne by the Company.  JAMS will also administer
the case consistent with the JAMS Cancellation/Continuance
Policy.  Any party who cancels or continues a hearing after
the deadline will be responsible for 100% of the
professional fees unless we can fill the reserved but
unused time with another matter.

Concurrent with the appointment notice of Ms. Shelanski,
the parties received a copy of the "Disclosure Checklist for All
Arbitrations," which Ms. Shelanski had signed on February 6,

4

2018.  In response to question 4(d) of the checklist, Shelanski checked the "yes" box indicating that within the preceding five years, she had served "[a]s dispute resolution neutral other than an arbitrator in another prior or pending case involving a party, lawyer for a party, or law firm in the current arbitration."  She went on to explain:

> I have not met or worked with any of the attorneys in this matter.  I was the mediator in one closed matter in which the Foley & Lardner firm (not Donald W. Schroeder, Esq. or Jillian M. Collins, Esq.) appeared.  Nothing in the above alters my ability to be fair, impartial, and independent in this arbitration.

Additionally, at the bottom of the Disclosure Checklist, the following "Declarations" appear directly above the signature of the appointed arbitrator:

1. Having been nominated or appointed as an arbitrator, I have made a reasonable effort to inform myself of any matters that could cause a person aware of the facts to reasonably entertain a doubt that as the proposed arbitrator I would be able to be impartial.  In addition, I have disclosed all such matters to the parties.

2. I practice in association with JAMS.  I and each other JAMS neutral have an economic interest in the overall financial success of JAMS.  In addition, because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceeding with the parties, counsel or insurers in this case and may do so in the future.

3. My responses to the questions above are true and correct to the best of my knowledge.

4. Please note JAMS neutrals regularly engage in speaking engagements, CLEs, discussion groups and other professional activities, and it is possible that a lawyer

or law firm connected with this proceeding either
attended, participated or was on a panel with the
Arbitrator.

Subsequent to the appointment of Arbitrator Shelanski, the
parties proceeded to engage in discovery which appears to have
been limited under JAMS' Rules with regard to, *inter alia*, the
number of depositions which could be taken by the parties.  The
Arbitration Hearings at which the evidence was presented
commenced on September 5, 2019 and continued over six days,
concluding on September 12, 2019.  On October 21, 2019, the
parties submitted post-hearing briefs and then presented closing
arguments on November 13, 2019.  Roughly one week prior to the
presentation of closing argument, via Notice dated November 5,
2019, JAMS forwarded a supplemental "Notice to All Parties"
together with a document entitled "JAMS Commencement Disclosure
(MKT0161)." Those documents reflected that Ms. Shelanski in fact
had a greater financial interest in JAMS than had previously
been revealed and that JAMS had had far greater contacts with
the law firm representing the Defendant than had been disclosed
at the outset of the matter.  Despite these revelations, no
objections were registered by either party at or contemporaneous
to the mailing of the November 5th notices.

On January 6, 2020, Arbitrator Shelanski issued her
decision ruling in favor of Respondent and dismissing
Petitioner's claims in their entirety.  Two days later,

6

Petitioner's counsel sent an email to Arbitrator Shelanski and Case Manager Douglas Duzant asking two questions: "(1) In how many matters has JAMS had the respondent in this case, NTT Data, and its parent and subsidiary companies, as a party in Arbitration or Mediation? [and] (2) Does Arbitrator Shelanski have an ownership interest in JAMS?"  A short time later, Mr. Duzant replied, noting that the information requested had been previously supplied on November 5th.  One month later, Petitioner filed the instant Petition to Vacate the Award on the grounds of evident partiality or corruption on the part of the arbitrator, misconduct in refusing to postpone the hearings and in refusing to hear evidence pertinent and material to the controversy pursuant to 9 U.S.C. §10(a)(2) – (3).  Respondent filed its Response in opposition and Cross-Petition to Confirm the Award on March 9, 2020.

## Discussion

1. *Principles Governing Confirmation and/or Vacatur of Arbitration Awards*

The general principles and rules for confirming and, in appropriate cases, vacating arbitration awards are outlined in Sections 9 and 10 of the Federal Arbitration Act, 9 U.S.C. §§9 and 10, which read as follows in relevant part:

**§9.  Award of arbitrators; confirmation; jurisdiction; procedure.**

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award and thereupon the court must grant such an order unless the award is vacated, modified or corrected as prescribed in sections 10 and 11 of this title [9 U.S.C. §§10 and 11].  If no such court is specified in the agreement of the parties, then such application shall be made to the United States court in and for the district within which such award was made. …

**§10.  Same; vacation; grounds; rehearing.**

**(a)**   In any of the following cases the United States court in and for the district where the award was made may make an order vacating the award upon application of any party to the arbitration –

    **(1)**   where the award was procured by corruption, fraud, or undue means;

    **(2)**   where there was evident partiality or corruption in the arbitrators, or either of them;

    **(3)**   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

    **(4)**   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

…

Inasmuch as the Federal Arbitration Act is something of an anomaly in the field of federal court jurisdiction, it does not

in and of itself provide a federal cause of action for vacatur
of an arbitration award.  Goldman v. Citigroup Global Markets,
Inc., 834 F.3d 242, 249-250 (3d Cir. 2016)(citing Moses H. Cone
Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 25,
n.32, 103 S. Ct. 927, 74 L. Ed.2d 765 (1983)).  Rather, "it
creates a body of federal substantive law establishing and
regulating the duty to honor an agreement to arbitrate," and
"hence there must be diversity of citizenship or some other
independent basis for federal jurisdiction before an order can
issue."  Moses H. Cone, id.

Moreover, the Federal Arbitration Act (hereafter "FAA")
imposes a strong presumption in favor of enforcing arbitration
awards.  Prospect CCMC LLC v. Crozer Chester Nurses
Association/Pennsylvania Ass'n. of Staff Nurses & Allied
Professionals, Nos. 19-1439, 19-1440, 2020 U.S. App. LEXIS 5841
at *7 (3d Cir. Feb. 26, 2020)(citing Hamilton Park Health Care
Center Ltd. v. 1199 SEIU United Health Care Workers East, 817
F.3d 857, 861 (3d Cir. 2016)).  Accordingly, the Courts properly
review such awards under an "`extremely deferential standard,'
the application of which 'is generally to affirm easily the
arbitration award.'"  Hamilton Park, id, (quoting Dluhos v.
Strasberg, 321 F.3d 365, 370 (3d Cir. 2003)).  However,
notwithstanding this "deferential language," … "the courts are
neither entitled nor encouraged simply to 'rubber-stamp' the

9

interpretations and decisions of arbitrators." Id. (quoting
Matteson v. Ryder Systems, Inc., 99 F.3d 108, 113 (3d Cir.
1996)).  To be sure, "a fair trial in a fair tribunal is a basic
requirement of due process." Withrow v. Larkin, 421 U.S. 35,
46, 95 S. Ct. 1456, 1465, 43 L. Ed.2d 712 (1975)(quoting In re
Murchison, 349 U.S. 133, 136 (1955).  "In sum, when parties
agree to resolve their disputes before an arbitrator without
involving the courts, the courts will enforce the bargains
implicit in such agreements by enforcing arbitration awards
absent a reason to doubt the authority or integrity of the
arbitral forum." Sutter v. Oxford Health Plans, LLC, 675 F.3d
215, 219 (3d Cir. 2012).

Whether there is or may be reason to doubt the authority or
integrity of an arbitrator or his or her forum, the Supreme
Court has held that §§ 10 and 11[2] respectively provide the FAA's

---

[2] Section 11 has not been invoked in this matter as a basis upon which to set
aside the arbitrator's award.  It provides grounds for correction or
modification of such an award by virtue of the following language:

   In either of the following cases the United States court in and for the
district wherein the award was made may make an order modifying or correcting
the award upon the application of any party to the arbitration –

> (a) Where there was an evident material miscalculation of figures or
>     an evident material mistake in the description of any person,
>     thing or property referred to in the award.
>
> (b) Where the arbitrators have awarded on a matter not submitted to
>     them unless it is a matter not affecting the merits of the
>     decision upon the matter submitted.
>
> (c) Where the award is imperfect in matter of form not affecting the
>     merits of the controversy.

exclusive grounds for expedited vacatur and modification.  Hall
Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 584,
128 S. Ct. 1396, 1403, 170 L. Ed.2d 254, 263 (2008).  Here,
Petitioner Martin moves to vacate on three grounds -  evident
partiality pursuant to 9 U.S.C. §10(a)(2), misconduct in
refusing to postpone the hearing and in refusing to hear
evidence pertinent and material to the controversy or of any
other misbehavior by which the rights of any party have been
prejudiced pursuant to 9 U.S.C. §10(a)(3), and "manifest
disregard of the law," which appears to be a judicially created
ground for vacatur the validity and/or viability of which is
unclear since the Supreme Court decided Hall Street.  See, e.g.,
Prospect CCMC, 2020 U.S. App. LEXIS at *8 (citing Stolt-Nielsen
v. AnimalFeeds Int'l Corp., 559 U.S. 662, 672, n.3, 130 S. Ct.
1758, 176 L. Ed.2d 605 (2010) and Whitehead v. Pullman Grp.,
LLC, 811 F.3d 116, 120-121 (3d Cir. 2016))("After the Supreme
Court's decision in Hall Street, it is unclear whether that
rationale [manifest disregard of law] provides an independent
basis for setting aside arbitration awards").[3]

_____

        The order may modify and correct the award, so as to effect the intent
thereof and promote justice between the parties.

[3] Inasmuch as there is now a circuit split on this question and the Third
Circuit has yet to weigh in with a definitive decision since Hall Street and
Stolt-Nielsen were decided, as have other courts in this district, we shall
assume without deciding that manifest disregard may still be considered as
grounds for vacating an arbitration decision.  See e.g., Prospect CCMC v.
Crozer-Chester Nurses Association, Nos. 19-1439, 19-1440, 2020 U.S. App.
LEXIS 5841 at *9 - *10 (3d Cir. Feb. 26, 2020); Simons v. Brown, Civ. A. No.

*a.  Evident Partiality – 9 U.S.C. §10(a)(2).*

Here, Petitioner first asserts that the decision issued by the arbitrator, Vivian Shelanski, should be set aside under FAA §10(a)(2) because she failed to timely disclose the full extent of her financial interest in JAMS and because JAMS very belatedly revealed the number of arbitrations and mediations which it had conducted in which the law firm representing Respondent was involved.

The matter of what does and does not constitute evident partiality on the part of arbitrators is one which has been litigated for more than the last 40 years.  In the 1968 case of Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S. Ct. 337, 21 L. Ed.2d 301 (1968), the U.S. Supreme Court endeavored to resolve whether "the elementary element of impartiality taken for granted in every judicial proceeding are suspended when the parties agree to resolve a dispute through arbitration."  In that case, a painting subcontractor sued the sureties on a prime contractor's bond to recover payment for a job.  Pursuant to an arbitration clause in the painting contract, the prime contractor named one arbitrator, the subcontractor named a second and the two

---

19-5074, 2020 U.S. Dist. LEXIS 45454 at *24 (E.D. Pa. March 16, 2020); Knabb Partnership v. Home Income Equity, LLC, Civ. A. No. 17-373, 2017 WL 1397247, 2017 U.S. Dist. LEXIS 59485 at *5 (E.D. Pa. Apr. 19, 2017).

designated arbitrators then chose a third "neutral."  The third

arbitrator, however, unbeknownst to the subcontractor, had the

prime contractor as one of his regular customers.  No

information concerning this relationship was revealed to the

subcontractor until after an award had been made.  The

subcontractor then petitioned to set the award aside on the

grounds of partiality, but the district court refused and the

First Circuit Court of Appeals affirmed.  After granting

certiorari, in a plurality opinion authored by Justice Black in

which Justices Warren, Douglas and Brennan joined, the Court

answered the foregoing question in the negative, reasoning:

> This rule of arbitration [§18 of the Rules of the American
> Arbitration Association] and this canon of judicial ethics
> [33] rest on the premise that any tribunal permitted by law
> to try cases and controversies not only must be unbiased
> but must also avoid even the appearance of bias.  We cannot
> believe that it was the purpose of Congress to authorize
> litigants to submit their cases and controversies to
> arbitration boards that might reasonably be thought biased
> against one litigant and favorable to another.

393 U.S. 150, 89 S. Ct. 340.  In a concurring opinion[4] written by

Justice White in which Justice Marshall joined, it was clarified

that the Court was *not* deciding that arbitrators were to be held

to the same "standards of judicial decorum" as judges.  Instead,

Justices White and Marshall stated,

> …where the arbitrator has a substantial interest in a firm
> which has done more than trivial business with a party,

---

[4] Justices Fortas, Harlan and Steward dissented finding that as the award at
issue was unanimous and no claims of actual partiality, fraud, unfairness or
bias were made, it was properly confirmed.

> that fact must be disclosed.  If arbitrators err on the
> side of disclosure, as they should, it will not be
> difficult for courts to identify those undisclosed
> relationships which are too insubstantial to warrant
> vacating an award.

Id, 393 U.S. at 151-152, 89 S. Ct. at 340-341.

Although much confusion reigned in the years following the Supreme Court's decision in Commonwealth Coatings regarding the meaning of "evident partiality" in the context of §10(a)(2), that case did make clear that "arbitrators must tell the parties about any 'substantial interest they may have in a firm' that does business with one of the parties." Freeman v. Pittsburgh Glass Works, LLC, 709 F.3d 240, 252 (3d Cir. 2013)(quoting Commonwealth Coatings, 393 U.S. at 151-152).  In other words, there absolutely is a duty to disclose on the part of arbitrators and/or potential arbitrators, although "`failure to disclose,' in and of itself, is not a basis for vacating an arbitration award." Stone v. Bear, Stearns & Co., 872 F. Supp. 2d 435, 447 (E.D. Pa. 2012).  Instead, non-disclosure "has relevance in the vacatur context only to the extent that the non-disclosure reveals evident partiality". Id,(citing Scandinavian Reinsurance Co., Ltd. v. Saint Paul Fire & Marine Insurance Co., 668 F.3d 60, 76-77 (2d Cir. 2012)).

In Freeman, the Third Circuit set as its "first order of business," defining "evident partiality" under the FAA,

§10(a)(2).  It then went on to articulate the following
definition:

> An arbitrator is evidently partial only if a reasonable
> person would have to conclude that she was partial to one
> side. …The conclusion of bias must be ineluctable, the
> favorable treatment unilateral.

Freeman, 709 F.3d at 253(citing Andersons, Inc.  v. Horton
Farms, Inc., 166 F.3d 308, 329 (6th Cir. 1998); Kaplan v. First
Options of Chicago, Inc., 19 F.3d 1503, 1523, n. 30 (3d Cir.
1994) and Morelite Construction Corp. v. New York City District
Council Carpenters Benefit Funds, 748 F.2d 79, 84 (2d Cir.
1984)).

    Moreover, it is irrelevant whether this partiality is shown
to the party or the party's counsel.  (See, Freeman, at 255:
"[w]hether an arbitrator favors a party or its attorneys, the
harm to the other party is no less real").  Indeed, "'[e]vident
partiality' is strong language and requires proof of
circumstances 'powerfully suggestive of bias.'"  Kaplan, supra,
(quoting Merit Insurance Co. v. Leatherby Ins. Co., 714 F.2d
673, 681-82 (7th Cir.), cert. denied, 464 U.S. 1009, 104 S. Ct.
529, 78 L. Ed.2d 711 (1983)).

    In support of her argument in this case, Petitioner
directs this Court's attention to a recent 9th Circuit case with
a nearly-identical fact pattern – Monster Energy Co. v. City
Beverages, LLC, 940 F.3d 1130 (9th Cir. 2019).  That case arose

out of a 2006 exclusive sales agreement between City Beverages,

an Anheuser-Busch distributor doing business as Olympic Eagle,

and Monster Energy whereby Olympic agreed to promote and sell

Monster energy drinks for 20 years in an exclusive territory.

The contract permitted Monster to terminate the agreement

without cause upon payment of a severance fee and included an

arbitration clause before JAMS in Orange County, California.

Monster sought to terminate the agreement after a period of 8

years by offering to pay severance in the amount of $2.5

million.  In response, Olympic invoked a Washington state

statute prohibiting termination of franchise contracts absent

good cause and Monster filed an action in the District Court for

the Central District of California to compel arbitration, which

the District Court granted.  JAMS provided a list of 7 neutral

arbitrators and the parties chose one.  The Arbitrator's multi-

page disclosure statement contained an identical provision to

the one given in this case by Ms. Shelanski:

> I practice in association with JAMS.  Each JAMS neutral,
> including me, has an economic interest in the overall
> financial success of JAMS.  In addition, because of the
> nature and size of JAMS, the parties should assume that one
> or more of the other neutrals who practice with JAMS has
> participated in an arbitration, mediation or other dispute
> resolution proceeding with the parties, counsel or insurers
> in this case and may do so in the future.

The arbitrator in <u>Monster Energy</u> also disclosed that he

arbitrated a separate dispute between Monster and a distributor

which resulted in an award of some $400,000 against Monster but failed to disclose that he was also an owner-shareholder of JAMS and that JAMS had administered 97 arbitrations for Monster over the preceding five-year period.  Following two weeks of hearings, the arbitrator issued an award in favor of Monster and against Olympic Eagle.  Olympic then moved to vacate the award on the basis of the later-discovered information concerning Monster's substantial business relationship with JAMS and the arbitrator's ownership interest.  The district court confirmed the award but the 9th Circuit vacated:

> Here, the Arbitrator's failure to disclose his ownership interest in JAMS - given its nontrivial business relations with Monster - creates a reasonable impression of bias and supports vacatur of the arbitration award. Because we vacate the arbitration award, we also vacate the district court's award of post-arbitration fees to Monster.

940 F.3d at 1138.

Notwithstanding the remarkable factual similarities between Monster Energy and the case at hand, there are several important differences.  For one, in Monster Energy, although JAMS did indeed belatedly disclose the financial interest which its arbitrator had in it, JAMS did not make this disclosure voluntarily or before the award itself issued.  Instead it was only in response to the petitioner's subsequent investigation and over JAMS' refusal to divulge, that the full extent of the financial relationship was unearthed.  Further, the nature of

17

the Monster Energy holding appears to be at odds with the Third

Circuit precedent outlined in Freeman.  Unlike the 9th Circuit,

which evidently adheres to the viewpoint that failure to

disclose *is* by itself a sufficient basis upon which to vacate an

arbitration award, the Third Circuit has expressly declined to

treat non-disclosure cases differently than "non-bias" cases.[5]

As the Third Circuit held in Freeman:

> Freeman nevertheless argues that Kaplan[6] applies only to so-
> called actual bias cases (where the relevant facts were
> known and objected to beforehand), not to nondisclosure
> cases (where the relevant facts were not disclosed).  We
> see no reason to adopt a different standard for each type
> of case.  The Federal Arbitration Act does not distinguish
> between actual-bias and  non-disclosure cases – instead it
> condemns "evident partiality" in all cases.  9 U.S.C.
> §10(a)(2).  And Kaplan is sufficiently flexible to
> accommodate the vagaries of each case.  Accordingly, we
> join the Sixth Circuit in applying this standard in non-
> disclosure cases.  See, Nationwide Mut. Ins. v. Home Ins.,
> 429 F.3d 640, 644-45 (6th Cir. 2005).

From this language, we conclude that while failure and/or

refusal to disclose apparent interests or conflicts may be

compelling evidence of evident partiality, a party challenging

an award on this basis must nevertheless still produce "proof so

*powerfully suggestive of bias* that a reasonable person would

---

[5] For all intents and purposes, the Third Circuit thus joined the Second and
Sixth Circuits in its holding in Freeman.  See, Freeman, 709 F.3d at 254;
Nationwide Mutual Insurance v. Home Ins., 429 F.3d 640, 644-45 (6th Cir.
2005); Morelite Construction Corp. v. New York City District Council
Carpenters Benefiti Fundselite Construction Corp. v. New York City District
Council Carpenters Benefiti Funds, 748 F.2d 79, 84 (2d Cir. 1984).


[6] Kaplan v. First Options, supra.

*have* to believe that [the arbitrator] was partial to

Responden[t]." Stone v. Bear, Stearns, 872 F.Supp.2d at 447.

In assessing this proof, it is useful to consider the following

four factors utilized by Courts in the Second and Fourth

Circuits:

> (1)The extent and character of the personal interest,
> pecuniary or otherwise, of the arbitrator in the
> proceedings; (2) the directness of the relationship between
> the arbitrator and the party he is alleged to favor; (3)
> the connection of that relationship to the arbitrator; and
> (4) the proximity in time between the relationship and the
> arbitration proceeding.

Scandanavian Reinsurance v. St. Paul, 66 F.3d at 74 (citing

Three S Del., Inc. v. DataQuick Data Systems, 492 F.3d 520, 530

(4th Cir. 2007)).

In application of the preceding principles to the matter

now before us, we find that there was indeed a blatant and

indefensible failure on the part of Arbitrator Shelanski to

reveal that she had more than a mere "economic interest in the

overall financial success of JAMS," as she was one of a limited

number of JAMS' arbitrators who are also owner-shareholders.[7]

---

[7] The letter notice sent by JAMS on November 5, 2020 addressed to "all
parties" reads as follows:

> Vivien Shelanski is an owner panelist of JAMS. As such, she has an
> equal share ownership interest.  She has never received a profit
> distribution of more than .1% of JAMS total revenue in a given year.
> Vivien is not privy to information regarding the number of cases or
> revenue related to cases assigned to other panelists. As an owner she
> is not informed about how her profit distribution is impacted by any
> particular client, lawyer or law firm and she does not earn credit for
> the creation or retention of customer relationships.

Why she failed to make this revelation until nearly two months following the conclusion of arbitration hearings and after the submission of final briefing is also incomprehensible to this Court.  Were Ms. Shelanski a judge, in all likelihood, she would have been disqualified and her actions subject to ethical review.[8]  The Court is equally appalled by JAMS' failure to provide its "Commencement Disclosures" to the parties at the outset of this case.[9]  It wasn't until November 5, 2019 that the Commencement Disclosures were apparently sent reflecting that JAMS had, within the preceding five years, a total of 7 arbitrations and 31 mediations with the law firm representing Petitioner, 10 of which involved two of the attorneys representing Ms. Martin and a total of 72 arbitrations and 151 mediations with counsel from the law firm representing the respondent, three of which involved the individual attorneys participating on behalf of NTT in this case.  No cases prior to

---

The letter/notice is signed by Douglas Duzant, ADR specialist.

[8] See, e.g., In re Antar 71 F.3d 97, 101 (3d Cir. 1995)(noting that [28 U.S.C.] "§455(a) imposes a general duty on a federal judge to recuse whenever there is an appearance of judicial partiality").

[9]  Again, although JAMS provided a "Disclosure Checklist For All Arbitrations" on February 7, 2018, this disclosure provided only that Arbitrator Shelanski had never had a case with NTT Data, that she had previously served as a mediator in a closed case with Respondent's law firm, Foley & Lardner, LLP, but had not previously served as a neutral for either Donald W. Schroeder or Jillian M. Collins, Respondent's outside co-counsel.  That disclosure also stated that despite this prior mediation with Foley & Lardner, that did not alter Shelanski's ability to be "fair, impartial, and independent" in this arbitration.

this one involved Petitioner and 4 prior cases involved

Respondent.[10]

However, despite the clear appearances of impropriety posed

by these belated revelations, we are nevertheless constrained to

examine the record for that necessary evidence that is

"powerfully suggestive of bias" to support a finding of "evident

partiality."  In so doing, we consider the four factors outlined

by the Fourth and Sixth Circuits.  With regard to the first one,

the extent and character of the personal interest, pecuniary or

otherwise, of the arbitrator in the proceedings, we note that as

per the November 5, 2019 letter from JAMS ADR Specialist Douglas

Duzant, as an owner panelist with an equal share interest, Ms.

Shelanski  has never received a profit distribution greater than

than .1% of JAMS total revenue in a given year.  However,

depending upon what JAMS' total annual revenue is in a given

year (and this information does not appear in the materials

before us), this may well evince a significant pecuniary

---

[10] We note that this late amendment appears to violate Rule 15(h) of JAMS' own
Arbitration Rules:

> Any disclosures regarding the selected Arbitrator shall be made as
> required by law or within ten (10) calendar days from the date of
> appointment.  Such disclosures may be made in electronic format,
> provided that JAMS will provide a hard copy to any party that requests
> it.  The parties and their representatives shall disclose to JAMS any
> circumstances likely to give rise to justifiable doubt as to the
> Arbitrator's impartiality or independence, including any bias or any
> financial or personal interest in the result of the Arbitration or any
> past or present relationship with the parties and their
> representatives.  The obligation of the Arbitrator and their
> representatives to make all required disclosures continues throughout
> the Arbitration process.

interest on the part of its owner panelists, particularly in light of the fact that JAMS was paid some $84,000 by Respondent for this arbitration alone.  Accordingly, this Court shall assume for the sake of this analysis that Ms. Shelanski's economic interest is at least, somewhat significant.   This factor would therefore militate in favor of a finding of bias.

Turning to the second element, that of directness of the relationship between the arbitrator and the party he is alleged to favor, we find that while there is no connection between Arbitrator Shelanski and the respondent party, there is some relationship between Shelanski and the law firm representing Respondent and a significant relationship between JAMS and the Foley firm as evidenced by the 223 arbitration and mediation cases which it had with Foley attorneys over the preceding five years.  Thus, the second element likewise weighs in favor of a bias finding. However, the connection between that relationship (JAMS to Foley) and Ms. Shelanski appears attenuated at best. The third element is thus reflective of no bias.

Finally, the proximity in time between the relationship and the arbitration proceeding seems, from the evidence that has been presented to this Court, to be close in that the relationship between Respondent, its law firm and JAMS looks to be an ongoing one.   The fourth factor therefore also is suggestive of bias.

Our analysis does not end here, however, as Petitioner has failed to explain why she waited for some two months after the November 5, 2019 disclosures were made and until after the award in favor of the Respondent was entered on January 6, 2020 to lodge her challenge to the Arbitrator.  Under JAMS Arbitration Rule 27(b):

> If any Party becomes aware of information that could be the basis of a challenge for cause to the continued service of the Arbitrator, such challenge must be made promptly, in writing to the Arbitrator or JAMS.  Failure to do so shall constitute a waiver of any objection to continued service by the Arbitrator.

In addition, the Third Circuit has also made clear that in the arbitration context it frowns upon affording the losing party "a second bite at the apple."  Freeman, 709 F.3d at 250. Indeed, it now adheres to the "constructive knowledge standard" such that a party will be held to have waived a later challenge where it knew or should have known of the facts indicating partiality.  Goldman, Sachs & Co. v. Athena Venture Partners, L.P., 803 F.3d 144, 149 (3d Cir. 2015).  This standard thereby encourages the parties to conduct adequate due diligence prior to issuance of the award and promotes the arbitration goals of efficiency and finality while allowing a party to challenge an arbitration when it had no way of discovering the arbitrator's bias beforehand.  Id.  Here, while Petitioner may not have been able to discover the Arbitrator's interests before they were

actually disclosed, her failure to offer any explanation
whatsoever as to why she waited until *after* the award was
entered in this case is glaring.  In the absence of any evidence
that she made any effort to question or to even mention
Arbitrator Shelanski's non-disclosures and potential bias
promptly after the November 5, 2019 mailing or at the closing
arguments of the case, it appears that Petitioner was trying to
"game the system by rolling the dice on whether to raise the
challenge during the proceedings or wait until [losing] to seek
vacatur on the issue." Goldman, 803 F.3d at 150.  By so doing,
Petitioner waived her objections.  For these reasons, we
therefore decline to set aside the award on the basis of waiver.

   b. *Arbitrator Misconduct: Refusing to Postpone or Hear*
      *Evidence -- §10(a)(3).*

   Ms. Martin also moves to vacate the award at issue pursuant
to FAA §10(a)(3) because of Arbitrator Shelanski's refusal to
grant a postponement and to hear pertinent and material
evidence.  In so refusing, Petitioner avers that she was
prevented from developing a full evidentiary record and deprived
of a fair hearing.

   To reiterate, Section 10(a)(3) permits a court to vacate an
arbitration award where the arbitrator was guilty of misconduct
in improperly refusing to postpone the hearing or to hear
relevant and pertinent evidence or "of any misbehavior by which

the rights of any party have been prejudiced."  It is well-settled that "arbitrators have wide latitude in how they conduct proceedings," and hence a court's role in reviewing an arbitrator's procedural decisions is extremely limited.  Sabre GLBL, Inc. v. Shan, Nos. 18-2079, 18-2144, 779 Fed. Appx. 843, 856, 2019 U.S. App. LEXIS 19983 (3d Cir. July 3, 2019)(citing Office of Professional Employees International Union, Local 471 v. Brownsville General Hospital, 186 F.3d 326, 334-335 (3d Cir. 1999).  An arbitrator's error in excluding evidence can only support vacation of an award if it is "in bad faith or so gross as to amount to affirmative misconduct." Simons v. Brown, Civ. A. No. 19-5074, 2020 U.S. Dist. LEXIS 45454 at *13 (E.D. Pa. March 16, 2020)(citing United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S 29, 40, 108 S. Ct. 364, 98 L. Ed.2d 286 (1987)).  A court may vacate an arbitration award based on an arbitrator's error in "the receipt or rejection of evidence" only if the error "so affects the rights of a party that it may be said that he was deprived of a fair hearing." Id, (quoting Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir. 1968)).  Procedural irregularities must be so prejudicial that they result in "fundamental unfairness." Whitehead v. Pullman Group, LLC, 811 F.3d 116, 120 (3d Cir. 2016)(citing Teamsters Local 312 v. Matlack, Inc., 118 F.3d 985, 995 (3d Cir. 1997)).

Instantly, Petitioner first contends that Arbitrator Shelanski deprived her of a fair hearing by refusing to grant her request for a 60-day postponement to review Respondent's "eleventh hour" production of 900 pages of documents. According to Petitioner, this production occurred over a three-day period between August 20 and August 23, 2019 -- less than two weeks prior to the first scheduled hearing.

The record in this matter reflects that following the postponement request, Ms. Shelanski held a teleconference with the parties following which she reviewed copies of the documents produced. According to the two-page "Decision on Request for Adjournment of Hearing" authored by Arbitrator Shelanski on August 28, 2019, the 101 pages produced on August 30, consisted of 33 documents, some 55 of which were copies of powerpoints or corporate documents including a 17-page information and data privacy document from 2012. Fewer than 50 pages were emails or notes. Second, the 14 documents (comprising 114 pages) that were produced on the morning of August 23 included a 77-page Global Information Security Policy, copies of two other powerpoints of 17 and 9 pages, respectively, a mailing label and an affidavit from the claimant (Ms. Martin) attesting to a return of documents. There were only 8 pages of notes and/or emails. Finally, the arbitrator found that the 667-page production made on the afternoon of August 23 consisted of 36

documents, almost all of which were powerpoints or other forms of brochures, some of which were created by Ms. Martin.  Only 16 pages of that production were notes or emails.  Because all of the powerpoints and printed brochures duplicated Respondent's earlier productions, the arbitrator found there were only 75 pages of new material produced and that this did not warrant a 60-day postponement.

In view of the wide latitude and discretion afforded arbitrators in conducting the proceedings before them and the fact that Petitioner still had a week to digest and incorporate the 75-newly-produced pages of material into her preparation for the hearing, we cannot find that Arbitrator Shelanski's refusal to postpone was unreasonable or that it constituted the "fundamental unfairness" necessary to warrant vacatur.  We therefore deny Petitioner's motion to vacate on this ground.

Petitioner also avers that Arbitrator Shelanski prevented her from presenting evidence from the Boston Consulting Group ("BCG") that she had obtained through subpoena and which included a spreadsheet that purportedly showed egregious sexually discriminatory pay practices, a document never produced by NTT Data.  More particularly, Petitioner alleges that she had sought these materials in response to Respondent's interrogatory response that Ms. Martin's termination arose out of an in-depth review of Respondent's corporate hierarchy and corporate re-

design of Respondent's organizational structure conducted in conjunction with BCG.  Petitioner contends that by refusing to allow her to use any of these BCG documents in questioning witnesses during discovery or allowing Petitioner herself to view them,[11] Ms. Shelanski prevented her from ascertaining how and from whom the information in the spreadsheet was compiled and that this failure resulted in Shelanski's determination that the spreadsheet was "not a foundation for finding unequal pay practices."  To this argument, Respondent rejoins that Petitioner could have properly laid the foundation for and authenticated the spreadsheet at arbitration had she subpoenaed and called a BCG employee to testify to this information at the hearing and that in any event, the document was improperly produced pursuant to subpoena *duces tecum* issued by the Arbitrator.[12]

In considering these arguments, while we would agree with Petitioner that the BCG spreadsheet and other documents would

---

[11] These documents were designated "Attorneys Eyes Only" and Petitioner states that when the spreadsheet was used at the arbitration hearing, she was made to leave the room.

[12] Indeed, in denying Respondent's request to subpoena materials from one of Petitioner's witnesses, Patrick Branigan, Arbitrator Shelanski acknowledged that under Hay Group, Inc. v. E.B.S. Acquisition Corp. 360 F.3d 404 (3d Cir. 2004), Section 7 of the Arbitration Act authorized arbitrators to issue subpoenas only compelling the production of documents and attendance of witnesses in hearings before them. Despite this ruling and recognition that the Third Circuit's ruling in Hay Group bound her in this case, Ms. Shelanski nevertheless denied Respondent's pre-hearing motion to preclude Petitioner from using the BCG documents which she had obtained via subpoena *duces tecum*, holding that "[a]ny objections to the evidentiary use of materials obtained in discovery will be addressed at the hearing on a case-by-case basis."

certainly be relevant to the central issue in this case, *i.e.*, the basis for the termination of Petitioner's employment, relevance does not, in and of itself, equate to automatic admission of evidence.  It remained incumbent upon Petitioner and her counsel to lay a proper foundation for the admission of that evidence through whatever witnesses they deemed appropriate.  Knowing in advance that the material had been designated "attorneys' eyes only" and that Ms. Martin was precluded from viewing it herself, it is difficult to understand why Petitioner did not avail herself of the Arbitrator's subpoena power to call a BCG representative to authenticate the document.  Given that a court may vacate an arbitration award based on an arbitrator's error in "the receipt or rejection of evidence" only if the error "so affects the rights of a party that it may be said that he was deprived of a fair hearing," we cannot find that that high bar has been reached here.  We therefore deny the motion to vacate on this ground as well.

    *c. Manifest Disregard*

Finally, Petitioner moves for vacatur for the reason that Arbitrator Shelanski manifestly disregarded applicable legal standards in rendering her decision.  In particular, Petitioner avers that Ms. Shelanski manifestly disregarded the law applicable to retaliation claims under Title VII and the PHRA.

"The manifest disregard standard requires more than legal error." Whitehead v. Pullman, 811 F.3d at 121.  Indeed, the standard is "extremely deferential" and the arbitrator's decision "'must fly in the face of clearly established legal precedent,' such as where an arbitrator 'appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.'"  Id, (citing Dluhos v. Strasberg, 321 F.3d at 370; Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir. 1995); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir. 1986)).  See Also, Sabre GLBL, Inc. v. Shan, Nos. 18-2079, 18-2144, 779 Fed. Appx. 843, 850, 2019 U.S. App. LEXIS 19983 (3d Cir. July 3, 2019) and Bellantuono v. ICAP Securities, USA, No. 12-4253, 557 Fed. Appx. 168, 174, 2014 U.S. App. LEXIS 1859 (3d Cir. Jan. 30, 2014)(same). Thus, the Third Circuit has held that there "must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award."  News America Publications, Inc. Daily Racing Form Division v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3d Cir. 1990).

Petitioner argues that in rejecting her claim that Respondent retaliated against her by filing a breach of contract claim against her just two weeks after she filed her demand for arbitration and in finding that her removal from Respondent's

Leadership Council could not be the basis for such a claim because it involved no change to her title, duties, or compensation, Shelanski ignored the standard for retaliation articulated by the Supreme Court in Burlington Northern & Santa Fe Railroad Co. v. White Northern & Santa Fe Railroad Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed.2d 345 (2006). Specifically, the Burlington Northern court held that "the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." 548 U.S. at 57. Instead, "the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." Id. … "[T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."

In reviewing Arbitrator Shelanski's written decision, we find that she recited the correct standard and pre-requisites for establishing a *prima facie* case of both discrimination and retaliation.[13] Then, in applying those legal principles, she

---

[13] Specifically, the Decision states in relevant part:

> In order to establish a prima facie case of gender discrimination, the requirements under Title VII and the PHRA are the same: a claimant must prove that: (i) she is a member of a protected class; (ii) she was qualified for the job in question; (iii) she suffered an adverse employment action that affected the terms and conditions of employment; and (iv) the circumstances support an inference of discrimination. *See, Geraci v. Moody-Tottrup Int'l, Inc.,* 82 F.3d 578, 580-81 (3d Cir. 1996)(*citing Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248,

found that Petitioner had failed to prove that the decision to remove her from the Leadership Council was discriminatorily based on her gender or in retaliation for her expressed concerns about Respondent's failure to promote women and minorities and that the filing of Respondent's counterclaim was retaliatory. Specifically, Arbitrator Shelanski determined that inasmuch as Petitioner was not the only person removed from the Leadership Council when then-CEO McCain decided to reduce the number of direct reports and the other individual removed was a male, and since the only consequence of removal was a reduction in the number of subordinates that she could invite to certain company conferences with no other changes to the terms or conditions of her employment, Petitioner had failed in making out a *prima facie* case of discrimination.  Her proof that the action was

---

253 (1981)).  The fourth element may be satisfied by sufficient evidence that persons outside the protected class were treated more favorably.  *See, Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 318-19 (3d Cir. 2000).  If the Claimant meets this burden, the Respondent must come forward with legitimate, non-discriminatory reasons for the decision.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  If Respondent does so, the Claimant must demonstrate that the stated reasons were a pretext for unlawful action.

To establish a prima facie case of retaliation, Ms. Martin must show that: (i) she engaged in a protected activity; (ii) she suffered an adverse employment action after or contemporaneously with the protected activity; and (iii) there is a causal connection between her protected activity and NTT Data's adverse action.  *Marra v. Phila. Housing Auth.,* 497 F.3d 286, 300 (3d Cir. 2007).  If Ms. Martin meets this burden, NTT Data must articulate a legitimate, non-discriminatory reason for the adverse action.  *McDonnell Douglas,* 411 U.S. at 802; *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994).  If that burden is met, Ms. Martin must show that the explanation is false and that retaliation was the real reason for the action.  *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006).

retaliatory also failed because the only comments/complaints that Petitioner had made about disparate treatment before her removal from the Council had been made some two years beforehand.  Thus, the arbitrator concluded that a causal nexus between the complaints and the allegedly discriminatory and/or retaliatory decision had not been established and, even giving Petitioner the benefit of the doubt that a *prima facie* case *had* been made out, she failed to show that the reason proffered, *to wit*, that the CEO wanted to reduce the number of direct reports was false.

    In addition to these findings, Ms. Shelanski went on to discuss her consideration and analysis of the evidence presented by both sides in the matter and the basis for her ultimate finding that the retaliation claims had not been proven. While this analysis may not have been perfect, this Court finds that it was sound overall and adequately supported by evidence. Again, the manifest disregard standard requires more than legal error and the arbitrator's decision "must fly in the face of clearly established legal precedent." Whitehead, 811 F.3d at 121.  We do not find that to be the case here.  For this reason, we cannot justify setting the arbitrator's determinations aside nor can we find grounds to deny enforcement of the award on the basis of manifest disregard.

For all of the foregoing reasons, we deny Petitioner's
Motion to Vacate and grant Respondent's Motion to Confirm the
Arbitration Award entered in this matter on January 6, 2020.  An
Order follows.